# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Submitted on Briefs April 15, 2015

## LARRY TODD HOOVER v. MORGAN SIERA HOOVER

**Appeal from the General Sessions Court for Blount County**
**No. S-16915     William R. Brewer, Judge**

---

**No. E2014-01629-COA-R3-CV-FILED-JULY 16, 2015**

---

This post-divorce appeal presents the issue of whether the trial court erred in its modification of the parties' permanent parenting plan. The parties were married on March 28, 2009, with one child subsequently born of the marriage. The parties were divorced by final judgment dated August 25, 2011. The trial court concomitantly entered a permanent parenting plan, naming the mother primary residential parent and granting the father co-parenting time of 105 days per year with the child. Approximately eight months later, the father filed a motion seeking modification of the parties' permanent parenting plan, alleging that he had been exercising and should have been awarded at least fifty-percent co-parenting time with the child. Following a hearing conducted on July 31, 2013, the trial court temporarily modified the co-parenting schedule to award each parent equal time with the child. The court reserved the issue of a permanent residential schedule for further hearing. At a subsequent hearing conducted on June 24, 2014, the trial court considered a modification to the permanent parenting plan due to the child's having reached kindergarten age. Upon hearing proof regarding the child's best interest, the trial court entered an order maintaining the mother's status as primary residential parent and awarding the father 105 days of co-parenting time per year. Father timely appealed. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the General Sessions Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J., and D. MICHAEL SWINEY, J., joined.

Kevin W. Shepherd, Maryville, Tennessee, for the appellant, Larry Todd Hoover.

Lance A. Evans, Maryville, Tennessee, for the appellee, Morgan Siera Hoover.

**OPINION**

**I. Factual and Procedural Background**

The parties, Larry Todd Hoover ("Father") and Morgan Siera Hoover ("Mother"), were married from March 28, 2009, to August 25, 2011. One child, a son ("the Child"), was born of the marriage on August 7, 2009. At the time of the parties' divorce, the Child was two years old. Father had moved to North Carolina, where he still resided at the time of trial. The parties' original permanent parenting plan entered in conjunction with their divorce named Mother as primary residential parent and granted her annually 260 days of co-parenting time with the Child. Father was granted 105 days of co-parenting time. The parties agreed to meet in Asheville, North Carolina, to exchange the Child.

On April 13, 2012, Father filed a motion seeking modification of the existing permanent parenting plan, alleging that he had actually been exercising at least fifty-percent co-parenting time with the child. Father also alleged that Mother had given birth to another child and that her living situation was stressful and unstable. He feared that Mother might be abusing drugs or alcohol. Father proposed a parenting plan that named him as primary residential parent and that allowed the Child to spend periods of two weeks with each parent on an alternating basis.

Mother filed a response to Father's motion, positing that there had been no substantial and material change in circumstances that would merit a modification of the co-parenting schedule. Father subsequently filed an amended motion, alleging that the Child had reported that Mother's boyfriend had "hurt" him.

Mother filed a petition for contempt on January 29, 2013, asserting that Father had failed to pay the full amount of child support ordered. Mother also asserted that Father was required to return the Child to her on January 27, 2013, but refused to so do because Father had alleged that Mother's boyfriend hit the Child in the eye. Mother denied this allegation, also claiming that the Department of Children's Services had conducted an investigation and found that no inappropriate behavior had occurred. Mother subsequently amended her petition to allege that Father was "coaching" the Child to be dishonest and telling the Child that no one loved him except Father. Although the trial court found Father to be in contempt for failing to pay child support on May 7, 2013, it did not address Mother's other allegations.

During a hearing conducted regarding Father's motion on July 31, 2013, the trial court ordered both parties to undergo drug testing. Mother's test results proved positive for marijuana. Father was unable to produce a urine specimen. Consequently, the court

found that Father's failure to comply with the test would be considered a positive result, "especially in light of the court's further questioning of [Father], his demeanor during the hearing and his admission of prescription drug use." The trial court, *inter alia*, stated in its order that although it was concerned by allegations regarding the safety and welfare of the Child, the proof did not rise to the level of requiring a finding of dependency and neglect. The court temporarily modified the co-parenting schedule to permit each party to begin spending two weeks with the Child in alternating fashion. All other issues were reserved for further hearing. The court made no change to Mother's designation as primary residential parent.

On June 24, 2014, the trial court conducted a hearing regarding a modification to the permanent parenting plan due to the the Child's having reached kindergarten age. Before the hearing commenced, the trial court ordered the parents again to submit to drug screens. Both test results were negative. At the outset of the trial, the parties stipulated that a substantial and material change in circumstances had occurred due to the child's maturation to school age. The parties then presented proof regarding the best interest of the Child.

Father testified that he resides in North Carolina with his current wife, Lauren, and their daughter. His grandparents also live nearby. Father stated that he and Mother had been exchanging the Child for co-parenting responsibilities on an alternating two-week rotation, which schedule had worked well. According to Father, he enrolled the Child in an academic preschool in North Carolina, which he believed had prepared the Child for kindergarten. Father also related that the Child was involved in sporting and church events when living in North Carolina.

As Father explained, Mother had not enrolled the Child in preschool in Tennessee. In order to maintain consistency in the Child's educational progress, Father sent worksheets from the Child's preschool to Mother for the Child to complete when he was with her. According to Father, the worksheets were not always completed upon the Child's return.

Father related during trial that both he and his wife were employed outside the home, such that they "took turns" with child care duties. If needed, Father's grandparents assisted with child care responsibilities as well. Father acknowledged that he was attending college and would soon graduate. As Father explained, he spoke to the Child once a week via telephone when the Child was with Mother.

Although Father suggested that the Child was happy when with Father and enjoyed preschool and his other activities, he acknowledged that the Child loved Mother and should spend as much time with her as possible. According to Father's proposal, he

3

should be named primary residential parent, with Mother being granted 142 days of co-parenting time per year. In support of this proffer, Father opined that the Child's best interest warranted living primarily with Father but spending three weekends per month plus certain holidays with Mother in order to maximize her co-parenting time.

In turn, Mother testified that she had also been working with the Child to prepare for kindergarten. Although Mother admitted that she and the Child did not always complete all of the worksheets sent by Father, she claimed that the worksheets were often sent late and that the Child simply did not have enough time to finish them. According to Mother, she was seldom able to communicate with Father directly, having to instead communicate with and through Father's wife. Mother insisted that she had asked repeatedly for the names of the Child's preschool and physician in North Carolina. Father finally provided her the name of a "tutor" but never shared information regarding the Child's physician.

According to Mother, when the Child returned from his co-parenting time with Father, he would be "attached" to her and would not let her out of his sight. In her opinion, it always took a few days for the Child to return to his normal behavior. Mother testified that the Child was happy otherwise, enjoying the learning and church activities he engaged in when with Mother. Mother related that on occasion the Child had resorted to biting his fingernails, thereby developing infections. To aid in the Child's adjustment, Mother reported having taken him to meet with a counselor for a few months. Those visits ended, however, when the counselor transitioned to different employment.

Mother requested that she be named primary residential parent, asserting that this was in the Child's best interest. Acknowledging that it was important for the Child to spend time with Father, she proposed that Father should have co-parenting time of one to two weekends per month as well as a large portion of the Child's summer break.

Mother further testified that she was gainfully employed and was engaged to her live-in boyfriend, C.D. Mother stated that she and C.D. are the parents of a daughter, who also resides in their home. According to Mother, the drug test she failed in July 2013 was a "one-time thing," and she did not regularly use marijuana. Mother indicated that C.D. also no longer used marijuana. By Mother's account, she and C.D. had obtained their marriage license at the time of trial and planned to marry soon.

The maternal grandmother, Joy Barbeau, also testified, relating that she resided about three minutes from the home of Mother and the Child. Ms. Barbeau explained that while visiting regularly, she noticed that the Child was normally very happy and pleasant but often became upset and apprehensive a few days preceding visits with Father. She confirmed that on such occasions the Child would chew his fingernails and seemed quite

4

anxious. Upon return, the Child appeared "clingy," not allowing Mother out of his sight.

Ms. Barbeau added that her employment allowed her to leave each day at 3:00 p.m., such that she was available to assist Mother with child care. Ms. Barbeau related that Mother and C.D. had been living together for a few years and planned to marry. Notwithstanding C.D.'s previous marijuana use, to her knowledge, C.D. had abandoned its use since he and Mother were together.

A.H., C.D.'s mother, also testified, indicating that she likewise lived near Mother's home, seeing Mother and the Child almost daily. By reason of their close relationship, she considered the Child to be her grandson. Having been educated and trained as a special education teacher and with teaching experience in Knox and Blount Counties, she began working with the Child eight to nine months before trial. This had been at Mother's request to prepare him for kindergarten. A.H. explained her familiarity with the kindergarten curriculum and believed the Child to be well-prepared.

According to A.H., the Child loved Mother and would cling to her upon returning from Father's house. By her account, the Child so behaved for as long as a week at a time before returning to his usual fun, bright, and happy demeanor. As time for the Child's return to Father again approached, however, the Child became visibly agitated, whiny, and sometimes defiant, often crying and biting his fingernails.

In the opinion of A.H., the Child maintained a good relationship with her son, C.D. Although C.D. had a marijuana-related arrest as a teenager, the charge had since been expunged. According to A.H., her son no longer used marijuana.

Following the presentation of proof regarding the Child's best interest, the trial court entered an order maintaining Mother as primary residential parent. Father was awarded 105 days of co-parenting time per year, consisting of alternating weekends, the Child's fall and spring school breaks, a portion of the Child's winter break, and four weeks during the summer. Father timely appealed.

## II. Issue Presented

Father presents the following issue for review, which we have restated slightly:

Whether the trial court erred in naming Mother primary residential parent and in failing to increase Father's co-parenting time.

5

### III. Standard of Review

As this Court has explained, "a trial court may modify a custody award when a material change in the child's circumstances has occurred and a change in custody is in the child's best interests." *In re T.C.D.*, 261 S.W.3d 734, 743 (Tenn. Ct. App. 2007). Our Supreme Court has also elucidated the appropriate standard of review to be applied when making a determination regarding the propriety of a parenting plan modification:

> In this non-jury case, our review of the trial court's factual findings is de novo upon the record, accompanied by a presumption of the correctness of the findings, unless the preponderance of the evidence is otherwise. *See* Tenn. R. App. P. 13(d); *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002); *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984). We review the trial court's resolution of questions of law de novo, with no presumption of correctness. *Kendrick*, 90 S.W.3d at 569. Statutory interpretation is a question of law, which we review de novo. *Mills v. Fulmarque*, 360 S.W.3d 362, 366 (Tenn. 2012).

> A trial court's determinations of whether a material change in circumstances has occurred and whether modification of a parenting plan serves a child's best interests are factual questions. *See In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). Thus, appellate courts must presume that a trial court's factual findings on these matters are correct and not overturn them, unless the evidence preponderates against the trial court's findings. *See* Tenn. R. App. P. 13(d); *In re C.K.G.*, 173 S.W.3d [714,] 732 [Tenn. 2005]; *Kendrick*, 90 S.W.3d at 570; *Hass*, 676 S.W.2d at 555.

> Because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, *Holloway v. Bradley*, 190 Tenn. 565, 230 S.W.2d 1003, 1006 (1950); *Brumit v. Brumit*, 948 S.W.2d 739, 740 (Tenn. Ct. App. 1997), trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Massey-Holt v. Holt*, 255 S.W.3d 603, 607 (Tenn. Ct. App. 2007). Thus, determining the details of parenting plans is "peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn.

2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.* "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

*Armbrister v. Armbrister*, 414 S.W.3d 685, 692-93 (Tenn. 2013).

IV. Modification of Permanent Parenting Plan

Father argues that the trial court erred in its modification of the parties' permanent parenting plan. He specifically asserts that he should have been named primary residential parent or that at the least, his co-parenting time should have been maximized. The parties acknowledge that a stipulation was entered at the beginning of trial that a substantial and material change in circumstances had occurred since entry of the original permanent parenting plan. Neither party, however, clearly distinguishes between the standard for a material change in circumstances required to warrant a change in the primary residential parent, or "custody," and the somewhat lesser standard required to warrant only a modification in the residential co-parenting schedule. *See* Tenn. Code Ann. §§ 36-6-101(a)(2)(B)-(C); *Armbrister*, 414 S.W.3d at 703 (comparing the standard for an action to modify custody to the "'very low threshold for establishing a material change of circumstances' when a party seeks to modify a residential parenting schedule") (quoting *Boyer v. Heimermann*, 238 S.W.3d 249, 257 (Tenn. Ct. App. 2007)). Mother certainly did not stipulate that a change in primary residential parent was warranted. She instead requested a modification of the co-parenting schedule without any modification in custody. The trial court established this distinction at the outset of trial by inquiring that "the standard then is not comparative fitness, it's substantial material change of circumstance and the best interest, correct?" Both attorneys agreed with this conclusion. The trial court further stated in its order that "both parties stipulate that a substantial and material change of circumstances now exist based upon the distances between the parties and that the child is now of school age and will, in fact, enter school in the fall of 2014."

7

A.  Material Change in Circumstances

Regarding the standard a petitioning parent must meet to prove a material change in circumstances sufficient for consideration of whether custody modification is in the best interest of the child, as Father requested in this case, Tennessee Code Annotated § 36-6-101(a)(2)(B) (2014) provides in relevant part:

(B)    If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance.  A material change of circumstance does not require a showing of substantial risk of harm to the child.   A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

(i)    In each contested case, the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination.

*See also Armbrister*, 414 S.W.3d at 702-03.

In comparison, the standard a petitioning parent must meet to prove a material change in circumstances sufficient for consideration of whether modification of the residential co-parenting schedule is in the best interest of the child, as each parent sought separately to prove in this case, is set forth in subsection 36-6-101(a)(2)(C), which provides:

(C)    If the issue before the court is a modification of the court's prior decree pertaining to <u>a residential parenting schedule</u>, then the petitioner must prove by a preponderance of the evidence a material change of circumstance <u>affecting the child's best interest</u>.   A material change of circumstance does not require a showing of a substantial risk of harm to the child.   A material change of circumstance <u>for purposes of modification of a residential parenting schedule</u> may include, but is not limited to, <u>significant changes in the needs of the child over time, which may include changes relating to age; significant changes in the parent's living or working condition that significantly affect parenting</u>; failure to adhere to the parenting plan; or <u>other circumstances making a change in the residential</u>

<u>parenting time in the best interest of the child</u>.

(Emphasis added to highlight comparison.) *See also Armbrister*, 414 S.W.3d at 704 ("[W]e conclude that when the issue is modification of a residential parenting schedule, section 36-6-101(a)(2)(C) provides the governing standard for determining whether a material change in circumstances has occurred.").

The trial court in the instant action, *inter alia*, found in its final judgment that the parties had stipulated "that a substantial and material change of circumstances now exist based upon the distances between the parties and that the child is now of school age and will, in fact, enter school in the fall of 2014." As noted previously, the court chose to maintain Mother as primary residential parent, thus indicating that it found no material change in circumstances sufficient to warrant a change in this designation. We hold that the evidence does not preponderate against the trial court's decision that no material change in circumstances was shown that would merit a change in the designation of primary residential parent. *See Armbrister*, 414 S.W.3d at 703.

Father's contention that there was a substantial and material change sufficient to warrant his designation as primary residential parent is grounded in his argument that he was the more stable parent due to (1) his remarriage, (2) the Child's relationship with Father's new wife, (3) the proof regarding C.D.'s former use of marijuana, and (4) the fact that Mother and C.D. had changed residences more frequently than Father. Father also asserts that he has shown a greater disposition to provide for the Child's educational needs because Father enrolled the Child in academic preschool. The evidence demonstrates, however, that Mother's home environment was equally stable. She was also involved in a long-term relationship with C.D. with plans to marry, and testimony indicated that C.D. maintained a good relationship with the Child. The marijuana use was shown to have taken place in C.D.'s distant past. Further, Mother explained the necessity of the change in residences and presented proof regarding the suitability of her current home.

Regarding the educational issue, Mother demonstrated concern regarding the Child's readiness for kindergarten by requesting that A.H., a seasoned teacher familiar with the kindergarten curriculum, work with the Child and ensure that he was sufficiently prepared. As Mother also helped the Child complete certain worksheets sent by Father, she displayed appreciable interest and involvement in the Child's educational needs. We conclude that the evidence does not preponderate against the trial court's finding that although a material change in circumstances warranting a modification of the co-parenting residential schedule had occurred, it did not rise to the level required for a change in the primary residential parent. *See Armbrister*, 414 S.W.3d at 703 (noting the lower threshold required for a finding of a material change in circumstances when

9

considering a modification of a residential parenting schedule as opposed to a change in the primary residential parent).

## B. Best Interest of Child

Based on the parties' stipulation that a material change in circumstances warranting a change in the parenting schedule had occurred, the trial court was also required to apply the statutory "best interest" factors enumerated in Tennessee Code Annotated § 36-6-106 to determine whether a modification of the residential co-parenting schedule was in the best interest of the Child. *See Armbrister*, 414 S.W.3d at 705; *see also Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002). The version of Tennessee Code Annotated §36-6-106(a) (Supp. 2013)[1] in effect at the time the instant action was filed provided in relevant part:

    (a)     In a suit for annulment, divorce, separate maintenance, or in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child. In taking into account the child's best interest, the court shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set out in subdivisions (a)(1)-(10), the location of the residences of the parents, the child's need for stability and all other relevant factors. The court shall consider all relevant factors, including the following, where applicable:

        (1)     The love, affection and emotional ties existing between the parents or caregivers and the child;

        (2)     The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education

---

[1]The General Assembly has amended Tennessee Code Annotated § 36-6-106(a) (2014), effective July 1, 2014, to enumerate fifteen factors for the trial court's consideration when making a custody determination. *See* 2014 Tenn. Pub. Acts Ch. 617 (S.B. 1488). According to the preamble of Public Acts Chapter 617, the legislature's intent in amending the statute was to alleviate inconsistency and confusion caused by "different factors pertaining to judicial review of custodial arrangements and the establishment of residential schedules for minor children" that "differ[ed] slightly in their specifics," particularly among subsections 36-6-106(a), 36-6-404(b), and 36-6-108. *See id.* Because the instant action was commenced before the effective date of this amendment, the prior version of the statute controls our review of the trial court's analysis.

and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3)     The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; . . .

(4)     The stability of the family unit of the parents or caregivers;

(5)     The mental and physical health of the parents or caregivers;

(6)     The home, school and community record of the child;

(7)(A)     The reasonable preference of the child, if twelve (12) years of age or older;

   (B)     The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8)     Evidence of physical or emotional abuse to the child, to the other parent or to any other person; . . .

(9)     The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

(10)     Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the

11

child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Similarly, for "[a]ny final decree or decree of modification in an action for absolute divorce, legal separation, annulment, or separate maintenance involving a minor child," Tennessee Code Annotated §36-6-404(a) (2014) provides that an appropriate parenting plan shall:

(1) Provide for the child's changing needs as the child grows and matures, in a way that minimizes the need for further modifications to the permanent parenting plan;

(2) Establish the authority and responsibilities of each parent with respect to the child, consistent with the criteria in this part;

(3) Minimize the child's exposure to harmful parental conflict;

(4) Provide for a process for dispute resolution, before court action, unless precluded or limited by § 36-6-406; . . .

(5) Allocate decision-making authority to one (1) or both parties regarding the child's education, health care, extracurricular activities, and religious upbringing. The parties may incorporate an agreement related to the care and growth of the child in these specified areas, or in other areas, into their plan, consistent with the criteria in this part. Regardless of the allocation of decision making in the parenting plan, the parties may agree that either parent may make emergency decisions affecting the health or safety of the child;

(6) Provide that each parent may make the day-to-day decisions regarding the care of the child while the child is residing with that parent;

(7) Provide that when mutual decision making is designated but cannot be achieved, the parties shall make a good-faith effort to resolve the issue through the appropriate dispute resolution process, subject to the exception set forth in subdivision (a)(4)(F);

(8) Require the obligor to report annually on a date certain to the obligee, and the department of human services or its contractor in Title IV-D cases, on a form provided by the court, the obligor's income as defined by the child support guidelines and related provisions contained in chapter 5 of this title; and

(9) Specify that if the driver license of a parent is currently expired, canceled, suspended or revoked or if the parent does not possess a valid driver license for any other reason, the parent shall make acceptable transportation arrangements as may be necessary to protect and ensure the health, safety and welfare of the child when such child is in the custody of such parent.

Regarding residential provisions for each child, the version of Tennessee Code Annotated § 36-6-404(b) (2010) applicable to the instant action[2] further provided:

(b) Any permanent parenting plan shall include a residential schedule as defined in § 36-6-402. The court shall make residential provisions for each child, consistent with the child's developmental level and the family's social and economic circumstances, which encourage each parent to maintain a loving, stable, and nurturing relationship with the child. The child's residential schedule shall be consistent with this part. If the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the following factors:

(1) The parent's ability to instruct, inspire, and encourage the child to prepare for a life of service, and to compete successfully in the society that the child faces as an adult;

(2) The relative strength, nature, and stability of the child's relationship with each parent, including whether a parent has taken greater responsibility for performing parenting responsibilities relating to the daily needs of the child;

---

[2]The General Assembly has also amended Tennessee Code Annotated § 36-6-404(b) (2014), effective July 1, 2014, in keeping with the companion amendment to Tennessee Code Annotated § 36-6-106(a) described in the previous note. *See* 2014 Tenn. Pub. Acts Ch. 617 (S.B. 1488). Tennessee Code Annotated § 36-6-404(b) now states, "If the limitations of § 36-6-406 are not dispositive of the child's residential schedule, the court shall consider the factors found in § 36-6-106(a)(1)-(15)," referring to the fifteen best interest factors now enumerated in § 36-6-106(a). *See id.*

13

(3) The willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interests of the child;

(4) Willful refusal to attend a court-ordered parent education seminar may be considered by the court as evidence of that parent's lack of good faith in these proceedings;

(5) The disposition of each parent to provide the child with food, clothing, medical care, education and other necessary care;

(6) The degree to which a parent has been the primary caregiver, defined as the parent who has taken the greater responsibility for performing parental responsibilities;

(7) The love, affection, and emotional ties existing between each parent and the child;

(8) The emotional needs and developmental level of the child;

(9) The character and physical and emotional fitness of each parent as it relates to each parent's ability to parent or the welfare of the child;

(10) The child's interaction and interrelationships with siblings and with significant adults, as well as the child's involvement with the child's physical surroundings, school, or other significant activities;

(11) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment;

(12) Evidence of physical or emotional abuse to the child, to the other parent or to any other person;

(13) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child;

(14) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preference of older children should normally be given greater weight than those of younger children;

(15) Each parent's employment schedule, and the court may make accommodations consistent with those schedules; and

(16) Any other factors deemed relevant by the court.

In considering the statutory factors regarding the best interest of the Child found in Tennessee Code Annotated § 36-6-106, the trial court in its final judgment stated the following in pertinent part:

1.    Both parents have a strong degree of love and affection for the minor child.

2.    The Court finds that [Mother] is better disposed to provide the child with food, clothing, medical care, education, and the other necessary care the child needs.

3.    [Mother] is in a better position to offer continuity in the child's life.

4.    Both parents are equally stable.

5.    Both parents show appropriate mental and physical health.

6.    Both parents provide a stable home and appropriate schooling for the child.

7.    The preference of the child is not at issue due to the child's age.

8.    The Court makes no finding of physical or mental abuse.

9.    The character and behavior of other persons who reside in or frequent the parents' homes have been raised but the Court finds no inappropriate issues.

15

10.    By a slight preponderance of the evidence, the Court finds that [Mother] has the potential for future performance of parenting responsibilities.

Following our thorough review of the evidence presented in this matter, we determine that the evidence does not preponderate against the trial court's findings. Both parents clearly have a strong and loving bond with the Child. This factor and other factors weigh equally in favor of both parents. We agree with the trial court, however, that the factors regarding continuity and potential for future performance of parenting responsibilities are weighted slightly in Mother's favor. As previously explained, "trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges." *Armbrister*, 414 S.W.3d 692-93. In this instance, the trial court observed the witnesses and made determinations regarding their credibility. The court weighed the evidence and concluded that Mother could better offer the continuity that the Child needed and that she showed a slightly greater potential for future performance of parenting responsibilities. We find no error in this determination.

The trial court's findings demonstrate that it conducted a proper analysis of the statutory factors, focusing on those it found relevant among the ten factors provided in Tennessee Code Annotated § 36-6-106(a). Although the trial court did not expressly address each factor delineated in Tennessee Code Annotated § 36-6-404(b), we determine that a review of these factors and the evidence applicable to same does not change the result in this case. *See Armbrister*, 414 S.W.3d at 698 and 706 (recognizing that an analysis of the factors contained in Tennessee Code Annotated § 36-6-106(a) would be "quite similar" to an analysis of the factors contained in Tennessee Code Annotated § 36-6-404(b) and that omission of the analysis related to the latter factors "does not change the result nor is it likely to do so in most instances."). We affirm the trial court's determination regarding the best interest of the Child.

Father argues that the trial court erred in failing to maximize Father's co-parenting time with the Child. As previously explained, however:

[D]etermining the details of parenting plans is "peculiarly within the broad discretion of the trial judge.'" *Suttles v. Suttles*, 748 S.W.2d 427, 429 (Tenn. 1988) (quoting *Edwards v. Edwards*, 501 S.W.2d 283, 291 (Tenn. Ct. App. 1973)). "It is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Eldridge v. Eldridge*, 42 S.W.3d 82, 88 (Tenn. 2001). A trial court's decision regarding the details of a residential parenting schedule should not be reversed absent an abuse of discretion. *Id.*

> "An abuse of discretion occurs when the trial court . . . appl[ies] an incorrect legal standard, reaches an illogical result, resolves the case on a clearly erroneous assessment of the evidence, or relies on reasoning that causes an injustice." *Gonsewski v. Gonsewski*, 350 S.W.3d 99, 105 (Tenn. 2011). A trial court abuses its discretion in establishing a residential parenting schedule "only when the trial court's ruling falls outside the spectrum of rulings that might reasonably result from an application of the correct legal standards to the evidence found in the record." *Eldridge*, 42 S.W.3d at 88.

*Armbrister*, 414 S.W.3d at 692-93. Based on our thorough review of the evidence, we conclude that the trial court's parenting schedule was not the result of an abuse of discretion. We therefore affirm the permanent parenting plan adopted by the trial court in all respects.

## V. Conclusion

For the reasons stated above, we affirm the trial court's judgment in all respects. Costs on appeal are assessed to the appellant, Larry Todd Hoover. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

17